611 A.2d 737

**In re the Involuntary Termination of Parental Rights of Frank Leroy MATSOCK & Francis Matsock.**

**Appeal of Frank Leroy MATSOCK and Francis Matsock.**

Superior Court of Pennsylvania.

Argued March 17, 1992.

Filed June 23, 1992.

Duane Barnes, Warren, for appellants.

Thomas J. Bonavita, Asst. Public Defender, Warren, for all the children of Frank and Francis Matsock, participating parties.

Before ROWLEY, President Judge, and CIRILLO and BROSKY, JJ.

CIRILLO, Judge:

This is an appeal from a decree entered in the Orphans' Division of the Court of Common Pleas of Warren County

terminating the parental rights of appellant Frank Leroy Matsock. We reverse.

On January 7, 1988, pursuant to the Juvenile Act,[1] the Warren County Department of Children and Youth Services (CYS) petitioned Orphans' Court for temporary custody of all the Matsock children.[2] The petition stated:

> On 1/6/88, a sexual abuse referral [3] was received stating that the father, Frank Matsock, had digitally penetrated

1. Act of July 9, 1976, P.L. 586, No. 142 § 2, found in 42 Pa.C.S.A. § 6301 *et seq.* The primary purpose of the Juvenile Act is *"to preserve the unity of the family whenever possible* and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1) (emphasis added). The act provides for delinquent and dependent children. A dependent child is "a child who: (1) is without the proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302.

   Moreover, the foregoing purposes are to be achieved "in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety." 42 Pa.C.S.A. § 6301(b)(3). "Any decision to remove the child from his home must be reconciled with the paramount purpose of preserving the unity of the family." *In Re Angry,* 361 Pa.Super. 180, 184, 522 A.2d 73, 75 (1987) (citations omitted).

2. Frank and Francis Matsock have seven children. The first four, born in Genesee County, New York, are: J., born February 4, 1977; T., born May 19, 1978; M., born June 1, 1980; and F., the only boy, born August 19, 1981. The other three children, born in Warren County, Pennsylvania, are: T., the victim of the alleged abuse, who was born on August 25, 1983; K., born June 25, 1985; and K., who was born on April 22, 1988, after the other children had been removed from the parental home.

3. The record contains no information about the referral CYS received of the suspected child abuse. Consequently, we do not know whether the report was oral or written, whether the source was anonymous or identified, whether it came from an individual or an institution, or the circumstances under which the alleged abuse occurred. We are particularly curious about the circumstances under which the alleged abuse came to light, for we cannot fathom who was in sufficiently close association with the family or the child to make such an intimate observation.

   It is unlikely that the referral came from a caseworker, for a caseworker's observation would be a direct report and not a referral. In addition, based on a caseworker's observation CYS could have immediately petitioned the court for authorization to remove the children without first having to call in the Pennsylvania State Police

his daugh[t]er, T., in the vagina causing bleeding. It was confirmed by a physician that the[r]e were lacerations on the child's vulva. The home conditions were also very dirty and [the] family was using [the] kitchen stove as [a] heating source. The PA State Police took emergency custody of the children.[4]

The petition was granted on the eighth of January, and the requisite informal hearing was scheduled for January 11, 1988. Unfortunately, in the midst of that hearing Frank Matsock suffered a heart attack and was taken to the hospital, where he remained for approximately two weeks. The hearing was necessarily continued.[5]

to investigate. *Cf.* 23 Pa.C.S.A. § 6369 (no child protective services worker may enter a home to remove a victim of alleged abuse without judicial authorization). Similarly, as the medical documentation of the alleged abuse states simply that there were lacerations on the child's vulva—with no mention of any bleeding—it is unlikely that medical personnel reported suspected abuse. Moreover, medical documentation occurred *after* the child was removed from her home. The record contains no indication that the four year old was involved in pre-school, day care, or any other arrangement in which personal hygiene might be involved. Thus our bewilderment.

4. Section 6324 of the Juvenile Act provides:
A child may be taken into custody:

\* \* \* \* \* \*

(3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.
42 Pa.C.S.A. § 6324(3). According to the March 29, 1988 Family Service Plan Placement Amendment:
In January of 1988, the Agency received a referral alleging that T. was the victim of inappropriate intimate physical contact at the hands of Frank Matsock, Sr. The children were *assessed to be in danger by the police* and removed from the home. (emphasis added).

5. Section 6335(c) of the Juvenile Act provides that "[i]f requested by the party or ordered by the court the proceedings shall be recorded by appropriate means. If not so recorded, full minutes of the proceedings shall be kept by the court." 42 Pa.C.S.A. § 6335(a). The record forwarded to Superior Court contains neither a transcript nor "full minutes" of the abbreviated hearing. Thus we are unable to determine from the record if the Matsock children were declared dependent, either when the petition was granted on the January 8, 1988 or at the informal hearing on January 11, 1988. *See* 42 Pa.C.S.A. § 6341.

CYS drew up an amended family service plan, dated March 29, 1988, which indicates that the children were placed in foster homes. The plan also listed seven goals to be achieved as a prelude to reunification of the family. The first goal was to "obtain a sexual offender's evaluation for Frank, Sr. and to follow up on any and all recommendations made as a result of the evaluation." The other six goals were:

Frank and Francis need to cooperate and follow the recommendations of CYS.

Francis needs to improve housekeeping skills.

T. needs to be assessed for therapy as a victim of sexual assault.

Parents need to take active role in [biweekly, supervised] visits.

Mother needs to be a supportive advocate for her children, especially T.

Children need to learn appropriate social behavior.

A caseworker reviewed the plan with Francis and Frank Matsock, but as the caseworker noted on the plan, "Parents refused to sign. They stated that they disagreed w/ [with] the mention of a sexual offense by Frank Sr."

On May 17, 1988, the parents, the attorney for the children, and CYS entered into a Stipulation which the court then entered as an order. The Stipulation provided that Frank would attend sexual offender classes and parenting classes, Francis would attend parenting classes, and "[t]hey will also clean up the house, and that no cats will be in the residence from now on." The Stipulation also stated that if Frank's physician reported Frank's heart condition prevented him from traveling to the classes, CYS would try to arrange to have a sexual abuse counselor meet with Frank at the Matsock home.

Less than four months later, on September 28, 1988, CYS filed a petition for the Involuntary Termination of the

Parental Rights of Frank Matsock, Sr. under section 2511(a)(5) of the Adoption Act,[6] on the grounds that:

> The children have been removed from the care of the parent by the Court for a period of at least six months, the conditions which led to the removal or placement of the child[ren] continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child[ren] within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the children.

Orphans' Court conducted a hearing on the petition on November 7, 1988, and determined that Frank had made only minimal effort to achieve the goals in the amended family service plan. Consequently, in the order issued the next day the court stated that it was in the best interest and welfare of the children that Frank's parental rights be terminated. Nevertheless, the court granted Frank "an additional two months from the date hereof to affirmatively respond to the program of [CYS] and in the event of his failure to do so Respondent's parental rights shall be terminated."

On September 15, 1989,[7] CYS filed a second petition to involuntarily terminate Frank Matsock's parental rights.

---

6. Act of October 15, 1980, P.L. 934, No. 163, found in 23 Pa.C.S.A. § 2501 *et seq.*

7. The record does not indicate whether there was a disposition review hearing at the end of the two month period.

    Section 6351(e) of the Juvenile Act provides that, with certain exceptions, a disposition review hearing *shall be conducted every six months.* Section 6351(f) provides:

    At each disposition review hearing, the court shall:

    (1) determine the continuing necessity for and appropriateness of the placement;

    (2) determine the extent of compliance with the service plan developed for the child;

    (3) determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

On October 24, 1989 the court held an evidentiary hearing on the petition.[8] The trial court opinion indicates that Francis had been cooperative and had attended the parenting classes as mandated by the May 17, 1988 Stipulation. The opinion also states that Frank testified he is "in ill

> (4) determine the appropriateness and feasibility of the current placement goal for the child; and
> (5) project a likely date by which the goal for the child might be achieved.
>
> 42 Pa.C.S.A. §§ 6351(e) & (f). *See also In Interest of Paul S.*, 380 Pa.Super. 476, 552 A.2d 288 (1988).
>
> While the transcript of the April 4, 1991 termination hearing contains references to "Master's Review Hearings," the record forwarded to Superior Court is devoid of any transcripts or "full minutes of the proceedings" from *any* Master's Review hearing, despite the statutory mandate of section 6336(c) of the Juvenile Act. *See* 42 Pa.C.S.A. § 6336(c).

8. Despite the mandate of Pennsylvania Rule of Appellate Procedure 1931, and official certification that the record transmitted to this court "is a true and correct copy of the *whole and entire record* ...," the record sent by the former prothonotary of Warren County was woefully inadequate. The record transmitted to Superior Court contained only eleven documents; *three* copies of the April 21, 1991 "Adjudication," *three* copies of the April 24, 1991 Decree Nisi, and five miscellaneous documents. The record contained no documents filed prior to April 1991, and the transcript of the April 7, 1991 hearing was sent without the exhibits. It was only through the sustained efforts of the Pittsburgh office of the Superior Court Prothonotary, with the help of the new Warren County prothonotary, that we finally received the May 17, 1988 Stipulation, the transcript of the November 7, 1988 hearing, and various exhibits. Without the additional documents, which constitute part of the record, we would have been precluded from conducting an adequate review.

We note also that, pursuant to Pa.R.A.P. 1911(a), the "appellant shall order any transcript required...." Therefore, it was incumbent upon Frank Matsock's attorney to have a transcript of the October 29, 1989 hearing made part of the record. As this court recently stated:

> While we recognize that appellant is proceeding *in forma pauperis,* she has been represented by court-appointed counsel throughout the entire termination proceedings, and despite her indigent status, *"it is nonetheless appellant's responsibility to order the transcript required and ascertain its presence in the record prior to certification for appeal." Commonwealth v. Osellanie,* 408 Pa.Super. 472, 475, 597 A.2d 130, 131 (1991) (Cirillo, J., dissenting) (emphasis added).

*In Re: M.T., R.T. & H.T.,* 414 Pa.Super. 372, 381, 607 A.2d 271, 275–276 (1991) (footnote omitted) (citations omitted) (emphasis in original). The panel in *M.T.* noted that "[a]ppellant's indigent status does not impinge upon her ability to obtain a complete transcript because the county, not appellant, pays the cost of transcription." *Id.*

health with a severe heart problem, denies sexual abuse of the child, did not attend all of the sessions of parenting classes or sexual therapy because of ill health, stated he has cleaned up the domicile and that he intends to continue to live with his wife in the family home and was of the opinion he completed the programs." CYS recommended termination of the father's parental rights "so that the Agency could concentrate on upgrading the parental skills of the mother." According to the trial court, the Warren County sexual abuse counselor testified that Frank Matsock "remains in a denial milieu of sexually abusing his child and *the therapist recommends [Frank's] termination from the program because of his lack of cooperation, specifically his refusal to admit sexually abusing the child."*

In its opinion the trial court admitted that there was no precedent for terminating the rights of one parent in order to concentrate social services on the other parent. "We also recognize we cannot force [Frank] to admit his sexual abuse of the child, particularly when there has been no conviction to that allegation." The court denied the petition to terminate Frank's parental rights and ordered Frank to attend parenting classes and sexual abuse therapy sessions for an additional six months.

On March 1, 1991, CYS filed a third petition for the involuntary termination of parental rights pursuant to section 2511(a)(5) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5). With this petition, however, CYS sought to terminate the parental rights of *both* Francis *and* Frank Matsock. Shortly after an evidentiary hearing on April 4, 1991, the court stated in its opinion that:

We are convinced beyond any doubt the agency has met it burden the [sic] parental rights of the father must be terminated. We, however, find insufficient evidence to terminate the rights of the mother. *If the mother insisted on living with her husband* [9] *we would indeed find*

9. At the November 7, 1988 hearing Francis testified as follows:

Q. Are you planning on leaving Mr. Matsock at any time?

*sufficient evidence* inasmuch as her steadfast faithfulness to her husband does not exhibit her as an advocate for her children. (emphasis added).

Accordingly, the court entered a Decree Nisi on April 22, 1991 terminating Frank's parental rights to all of his children, ordering Francis Matsock to establish a "proper" domicile for herself and her four oldest children, forbidding Frank to "have the children in his possession at any time [or to] be in the home of the mother while the children are present," ordering Francis to continue her parenting classes, and to continue cooperating with CYS. In addition, CYS was authorized to continue monitoring and supervising the mother's home and care of the children. Custody of the three youngest children was to remain with CYS until "the agency determines the mother has appropriate facilities and is capable of protecting the children."

Counsel for the parents filed Exceptions to the Decree Nisi, which were argued and subsequently denied. The Final Decree terminating Frank's parental rights was entered on August 21, 1991. This timely appeal followed.[10]

> A. No, me and my husband get along good. It did come up though when I was talking to Sylvia [Pallott, a CYS caseworker] and she suggested if I left my husband I would get my children back.
> Q. At that point did you consider leaving your husband?
> A. I did consider it and she said if I went to the "Y" and stay there and then move to Allegheny Village maybe I would get one or two of the kids at the time.
> Q. But from Sylvia suggesting that it never entered your mind?
> A. No.
>
> Testimony from various CYS caseworkers confirms CYS introduced the idea of Francis leaving her husband. We find the suggestion to be of questionable propriety. As this court stated in *In Re Adoption of M.J.H.*, 348 Pa.Super. 65, 72, 501 A.2d 648, 651 (1985), "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, ... for as noble a purpose as any...." *Id.* (citation omitted).

10. We note that the notice of appeal, filed September 19, 1991, incorrectly listed the date of the order being appealed from as September 19, 1991, instead of August 21, 1991, the actual date of the Final Decree. This court granted Frank's petition to correct the date on the notice of appeal.

Frank presents the following questions for our consideration:

1. As the lower court acknowledged in its Final Decree that Frank and Francis were living separate and apart and had created a second household for the return of the children, was there still a clear necessity to terminate the father's parental rights?

2. Shall the lower court have permitted J.R.M., the fourteen year old daughter of the Matsocks, to testify as to her knowledge of the matter before the court and her views regarding termination.?

■ In reviewing an involuntary termination of parental rights we must "employ a broad, comprehensive review of the record," *In Re Adoption of T.M.F.*, 392 Pa.Super. 598, 616, 573 A.2d 1035, 1044 (1990) (en banc), *allocatur denied,* 527 Pa. 634, 592 A.2d 1301 (1990), in order to determine whether the Orphans' Court decree is supported by competent evidence. *Matter of Adoption of G.T.M.*, 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the findings of the Orphans' Court, [we] will not reverse a hearing court's decision to terminate." *In Re Shives*, 363 Pa.Super. 225, 228–229, 525 A.2d 801, 802 (1987). An abuse of discretion is "not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused." *Mielcuszny et ux. v. Rosol*, 317 Pa. 91, 93, 176 A. 236, 237 (1934).

■ In *In Re T.R.*, 502 Pa. 165, 465 A.2d 642 (1983), pursuant to *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), our supreme court held that "in all proceedings to involuntarily terminate parental rights, which are not yet final, the petitioner must prove the statutory criteria for that termination by *at least* clear and

We also note that, although only Frank's parental rights were terminated, Francis joined Frank in this appeal.

convincing evidence." 502 Pa. at 169, 465 A.2d at 644. (emphasis added). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 304, 555 A.2d 1202, 1203–1204 (1989). While we are bound by the Chancellor's findings of fact which are supported by the record, *In Re Adoption of J.J.*, 511 Pa. 590, 594, 515 A.2d 883, 885 (1986), we are *not* bound by the inferences, deductions and legal conclusions the Chancellor draws from those findings. *In Re Adoption of J.A.B.*, 487 Pa. 79, 88, 408 A.2d 1363, 1367 (1979); *Matter of M.L.W.*, 307 Pa.Super. 29, 33, 452 A.2d 1021, 1023 (1982).

"In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child[ren]." *In Re Adoption of Michael J.C.*, 326 Pa.Super. 143, 152, 473 A.2d 1021, 1026 (1984) (citation omitted), *reversed on other grounds*, 506 Pa. 517, 486 A.2d 371 (1984). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted *only* in exceptional circumstances," *id.*, and *"only* upon a showing of *clear necessity.*" *In Interest of C.M.E.*, 301 Pa.Super. 579, 586, 448 A.2d 59, 63 (1982) (emphasis added). Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. *Michael J.C., supra; C.M.E., supra.* In addition, "all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be measured in light of 'what would be expected of an individual in circumstances which the parent under examination finds himself.' " *In Re Adoption of B.D.S.*, 494 Pa. 171, 179, 431 A.2d 203, 207 (1981) (citations omitted); *In Re D.J.Y.*, 487 Pa. 125, 130, 408 A.2d 1387, 1389–1390 (1979).

■ In its "Adjudication" filed April 24, 1991, the trial court states that "**the underlying reason for the involuntary termination petition initiated on January 6, 1988 ... [was] a sexual abuse referral** ... The report was confirmed by a physician that there were lacerations on the child's vulva. The home conditions were also very dirty and the family was using the kitchen stove as a heating source." From the filing of that first petition, Frank has consistently denied he committed the alleged abuse. Although, as the court noted, a physician found lacerations on the child's vulva, the court cites no evidence, and there is none in the record, to establish that Frank—and only Frank—could have caused those lacerations. At the hearing on April 4, 1991, Francis testified, under oath, that, *"I talked to my daughter and she said nothing happened and I talked to the rest of them and they said nothing happened. I talked to my husband and he said nothing happened, what more can I say?"* [11] No charges of sexual abuse were ever filed against Frank; he has never been prosecuted for the alleged offense and he has never been convicted by the criminal justice system. Thus, Frank has never been afforded an opportunity to face his accuser(s) or to defend himself against the allegations. Despite this, the allegations form the basis for termination of his parental rights.

As a result of his steadfast denial of the alleged abuse, Frank was terminated from two different court-ordered sexual abuse therapy programs. In the words of the court, "the agency [CYS] was compelled to terminate the sexual abuse therapy as no progress was being made and could not be made as long as [Frank] maintained his denial." Thus, since he did not complete the therapy programs, Frank is considered an "untreated sexual offender."

**11.** At the same hearing the following exchange occurred between the trial court judge and Francis:
*Francis:* What's the question?
*Judge:* Whether or not your child, T., was sexually abused by your husband?
*Francis:* She said she wasn't.
*Judge:* I'm asking you what is your opinion.
*Francis:* I believe she wasn't, no.

The first therapy program, conducted in Warren County, used the "confrontational approach." At the April 4, 1991 hearing, Anthony Pedone, a licensed psychologist from the second program, testified:

It's a legitimate approach. They felt that he had committed the offense for which he was referred and they were confronting his denial and they were *more or less demanding that he admit to the offense* ...

Francis accompanied her husband to the second therapy program, conducted in Forest County, in which Pedone and a second therapist, Ann Rice, "decided to use a different approach that would be *trying to confront the denial* but in a more supportive way and in a manner that involved a lot of education [about what constituted sexual abuse]." After six or seven sessions Frank and Francis were terminated from the program because:

They came with the thought that through an evaluation and assessment that we would be able to prove that Frank had not committed offenses. We made it clear to them that individuals come to therapy are either are [sic] guilty or there's an indication [12] that the offenses had occurred ...

When asked what he meant by "denial," Pedone explained:

He is denying in fact that a specific instance occurred. *We are not talking about a psychological defense mechanism* because a lot of times people will deny something may have happened, I just do not remember it, and there is enough evidence t[hat] it probably did happen. Then

12. CYS determined that the sexual abuse referral was "indicated." *See* 23 Pa.C.S.A. § 6368. Under the Child Protective Services Law a referral of abuse is "indicated" whenever:

an investigation by the child protective service determines that substantial evidence of the alleged abuse exists based on any of the following:
(1) Available medical evidence.
(2) The child protective service investigation.
(3) An admission of the acts of abuse by the parent of the child or person responsible for the welfare of the child.
23 Pa.C.S.A. § 6303.

you try to work and you try to work through that conscious denial or unconscious denial, psychological defense mechanism and *Frank is saying that he is denying that the event occurred, that there was any breaking of the law, he is denying the fact that the incident occurred.*

Curiously, in a response a few questions later, Pedone stated that in one of the sessions he told Frank:

"We are here to help you, we are here to provide you therapy, we are not here to really crush you or break down your denial because *you are entitled to deny the offense.*" It really goes to the point where he just absolutely denies that anything occurred.

In its opinion of November 24, 1989, the court admitted that "we cannot force Respondent to admit his sexual abuse of the child, particularly when there has been no conviction to the allegation." Nonetheless, the court terminated Frank's parental rights stating that, "here we are confronted with a sexually abusing parent who, despite intensive offender's counseling, steadfastly refuses any acknowledgment and appropriate treatment for same despite the fact the children were removed from the family ... compounding the case is the mother's steadfast denial of her husband's conduct and her allegience to him." We are deeply troubled by this circular reasoning and the havoc it has wrought on the Matsock family.

Frank has never been adjudicated a sexual offender; the court and the sexual abuse therapists have labeled him an "untreated sexual offender" simply because he refuses to admit he is guilty, *as their treatment strategies require him to do.* The trial court not only terminated Frank's parental rights in response to his status as an "untreated sexual offender," but it also forced Francis to choose between her husband and their children. The court ordered Francis to establish a new household, separate and apart from her husband, which her husband could never enter when any of the children were present. The court plainly

stated that *if Francis failed to comply with this plan, her parental rights would also be terminated.*

In *Com. ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981), a panel of this court stated that the term "best interests of a child" is "a legal concept and is not to be defined in psychiatric [or psychological] terms." *Id.*, 289 Pa.Superior Ct. at 528, 433 A.2d at 1381. The *Grimes* court continued:

> For the law to base itself on [the medical model or treatment strategies], however, would transform the nature of the law as we have conceived of it and would entail great risk ... "The medical model proposes that conditions have discernable causes and scientific cures, and that the nonexperts, the rest of the population, should submit to the authority of these experts. Such legal considerations as procedurally protected rights need not be given major consideration since the experts will presumably only be operating in the interests of those they serve." J. Robitscher, The Powers of Psychiatry 38 (1980) (footnote omitted).

*Id.*, 289 Pa.Superior Ct. at 529, 433 A.2d at 1381.

Here, CYS and the therapists, unencumbered by procedural or constitutional considerations, made a unilateral determination that Frank sexually abused his daughter. Frank was promptly labeled a sexual offender and ordered to undergo treatment for his "illness," on pain of losing his children forever. The treatment strategy or "cure" the therapists utilized required Frank to participate by first admitting his guilt. Frank's refusal to admit his predetermined guilt negated his ability to be "cured," according to the experts. Therefore, Frank was summarily dismissed from the programs and labeled an "untreated sexual offender." At no time did CYS, the therapists or the court ever take Frank's protestations of innocence at face value; his denials of guilt were seen only as intransigence, proof that he was unwilling to actively work toward the reunification of his family.

As a result of his termination from the therapy programs, the trial court determined that the conditions which led to

the removal of the children continued to exist, that Frank could not or would not remedy those conditions, and that the services reasonably available to the Matsocks were unlikely to remedy the problem. Therefore, the court determined that the involuntary termination of Frank's parental rights would best serve the needs and welfare of his children. *See* 23 Pa.C.S.A. § 2511(a)(5). We cannot agree.

"The custody, care, nurture, and instruction of children resides first in the children's natural parents, as a constitutionally recognized fundamental right." *In re J.W.*, 396 Pa.Super. 379, 388, 578 A.2d 952, 957 (1990), *citing Lehr v. Robertson*, 463 U.S. 248, 257–261, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983). "A parent's right to raise his child is one of the most basic rights of western civilization. It is so much a part of our cultural tradition that our courts have enshrined it with constitutional protection despite its absence from the document's text." *In Re Adoption of J.J.*, 366 Pa.Super. 94, 103, 530 A.2d 908, 913 (1987) (en banc), *citing Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). "There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child ... These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child ... the parental obligation is a positive duty which requires affirmative performance." *Shives*, 363 Pa.Super. 225, 229, 525 A.2d 801, 803 (1987), *quoting In Re Burns*, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977) (citations omitted). "Accordingly, when a child has been placed in foster care, a parent has an affirmative duty to work towards the return of the child." *In re William L.*, 477 Pa. 322, 333, 383 A.2d 1228, 1233 (1978); *C.M.E., supra.* "We think this 'affirmative duty,' at minimum, requires a showing by the parent of a willingness to cooperate with the agency [CYS] to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." *In Re Adoption of J.J.*, 511 Pa. 590, 602, 515 A.2d 883, 890 (1986).

Pursuant to the May 17, 1988 Stipulation, Frank was required to attend sexual abuse counseling classes as well as parenting classes. At the April 4, 1991 termination hearing CYS caseworker Charlotte Huber testified as follows:

Q. With regard to the plan[13] as involved, you've also required that Mr. and Mrs. Matsock both participate in various programs?

Yes, in a Stipulation the Matsocks were required to attend parenting classes.

Q. Have they done so?

A. *Yes, they have.*

Q. With regard to Mr. Matsock you already testified that he did attend sexual abuse counseling classes held here in Warren County?

A. *Yes, he attended, yes.*

Q. And his participation cannot end at his request, that ended at the request of the Counselor of the program.?

A. *That's correct.*

Q. After that he also attended a series of counseling sessions in Tionesta [Forest County]?

A. Yes.

Q. And has he attended those classes regularly? Are those sessions regular?

A. *Yes, he did.*

Q. His termination from those sessions was not at his request, but rather at the request of the Counselor?

A. *That's correct.*

In response to a query from the court, Pedone specifically stated that in the Forest County sessions the Matsocks were not merely silent observers; they cooperated and complied with the rules of therapy. "[T]hey ha[d] give and take, there was a lot of discussion, so they cooperated and complied in that way." In addition to attending counseling sessions and parenting classes, Frank testified that he had "cleaned up" the family domicile. Frank and Francis, as

13. *See* footnote seven, *supra.*

well as a CYS caseworker, testified that Frank had helped his wife establish a separate residence and had repaired the plumbing and various cracks in the walls. He obtained a car for Francis. After a slow start,[14] Frank accompanied his wife to the bi-weekly supervised visits with their children. Thus the situation here is unlike the one addressed in *Matter of Adoption of G.T.M.*, 506 Pa. 44, 483 A.2d 1355 (1984).

In *G.T.M.*, an intellectually limited parent of a child with multiple and severe behavioral problems refused to attend counseling sessions, dropped out of parenting classes, rarely visited her child, and when she did the parent either lost her temper or barely interacted with the child, and only improved the unsanitary, roach-infested living conditions when she married. Our supreme court upheld the involuntary termination of her parental rights because, aside from moving to a more sanitary residence with a new husband who had behavioral problems of his own, the mother had done nothing to improve her ability to parent; she merely offered promises of better behavior in the future.

Similarly, in *Matter of Adoption of C.A.E.*, 516 Pa. 419, 532 A.2d 802 (1987), our supreme court upheld the involuntary termination of a mother's parental rights because she

**14.** The sexual abuse counselor from Forest County, Anthony Pedone, testified that another psychologist had given Frank evaluative tests. Pedone further testified that he had reviewed the results and Frank's "I.Q. rating came out borderline at anywhere from 68 to 72 and mentally retarded or borderline parents can be very good parents and we took extra care to specifically explain everything." Frank testified that he had to quit school in the sixth grade, and that he receives a disability pension from the Veteran's Administration. For some unspecified reason, Frank is unable to drive. Frank suffers from severe health problems, including a bad heart and high blood pressure. He takes daily medication.

Initially, Frank did not attend the scheduled visits with his children because they were on the second floor of a building which had no elevator and Frank believed his physician had told him after his heart attack not to climb stairs. After the Judge emphatically told Frank that he did not believe him and found his excuses to be incredible, Frank's attendance at all the court ordered programs improved. According to the court's opinion of November 24, 1989, "[t]he cases are replete that if there is any effort made by a respondent to perform his parental duties termination is not proper."

had done nothing to work toward the return of her infant other than petition the court for custody and make sporadic visits while he was hospitalized during the first year of his life. C.A.E., the lone survivor of triplets born four months prematurely, suffered from arrested physical development and severe respiratory problems which would require intense and constant medical care for several years. Although the mother had managed to get her own troubled life back in order, she had never even learned the medical procedures necessary to care for her son. The mother's own testimony that once she was awarded custody she would be capable and willing to care for her son, without some demonstration of that willingness or ability, was insufficient to prevent the involuntary termination of her parental rights.

Unlike *C.A.E.*, here the record contains credible evidence that Frank has made affirmative efforts to prepare for the return of his children and to enable him to be a better parent to them. "What is important is the demonstrated willingness and ability of the parent to perform, at a minimal level, his or her parental duties." *In Re Adoption of J.J.*, 511 Pa. at 608, 515 A.2d at 893 (citations omitted); *In Re Anderson*, 317 Pa.Super. 490, 495, 464 A.2d 428, 430 (1983); *Shives, supra.* We, therefore, conclude that Frank fulfilled his "affirmative duty to work towards the return of his child[ren]." *William L., supra; In Re Adoption of J.J., supra.*

The term "needs and welfare" is a legal concept, *Grimes, supra,* that "denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love." *In Re Coast*, 385 Pa.Super. 450, 466, 561 A.2d 762, 770 (1989) (en banc), *allocatur denied*, 525 Pa. 593, 575 A.2d 560 (1990); *Michael J.C.*, 326 Pa.Super. at 159, 473 A.2d at 1029. "Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love." *In re P.A.B.*, 391 Pa.Super. 79, 86, 570 A.2d 522, 525 (1990); *J.W.*, 396 Pa.Super. at 391, 578 A.2d at 958. "It is universally agreed that the bond of

parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima-facie* in the best interest of the child and the state has no justification to terminate that bond." *J.W.*, 396 Pa.Super. 379, 391, 578 A.2d 952, 958 (1990). "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues *against* termination, rather than fosters it." *P.A.B.*, 391 Pa.Super. at 86, 570 A.2d at 525. (emphasis supplied). Moreover, pursuant to section 2511(a)(5), *a court "must examine the status of the natural parental bond* to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *Id.* (emphasis added).

At the November 1991 termination hearing the attorney for the children attempted to call the Matsocks' oldest child, then fourteen, to testify, because

in view of her age that she should have knowledge of this matter, that she should have some opportunity to voice her opinion as to what her wishes are.

The court refused to permit the daughter to testify, stating:

there's been many cases as long as my arm that an issue of this nature, and this may shock you a little bit, *the welfare of the children is not at issue. We're not here to determine what is best for the children, we're here to determine if the parental rights should be terminated.* There are ample cases what the children think is not at all dispositive and I don't mean to say when I say we're not here for the welfare of the children, yes, that's the bottom line or we wouldn't be here, their happiness and so forth is not a central issue. The Court has to make a determination *if these parents can parent and what all that means is physical health, spiritual growth, social growth, et cetera,* and that isn't the duty of the children to make that determination, that's what I'm saying, that what these cases are holding. *All these children could come in and tell the Court we want to stay with our*

*mother and father and I would be surprised if they didn't,* but the cases say the Court has to concentrate on whether or not the parents can parent their children.

■ It is well established in the Commonwealth that "[c]ourts are required *not only* to focus on the behavior of the parent *but more importantly, are required to consider the effects of termination on the welfare of the child."* *In Re Adoption of Hamilton,* 379 Pa.Super. 274, 280, 549 A.2d 1291 (1988) (citation omitted) (emphasis added). Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. *Coast, supra; Michael J.C., supra; J.W., supra.* "Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful." *William L.,* 477 Pa. at 348, 383 A.2d at 1241.

Section 2511 of the Adoption Act, which delineates the requirements for the involuntary termination of parental rights, is divided into two subsections. Subsection (a) consists of five paragraphs, each of which provides a separate basis for involuntary termination. Our supreme court, and this court sitting en banc, have determined that *all* the requirements set forth in the particular paragraph being utilized must be met *before* a court is required to consider subsection (b). *In Re Adoption of J.J.,* 511 Pa. at 607, 515 A.2d at 892; *Coast,* 385 Pa.Super. at 466, 561 A.2d at 770; *Michael J.C.,* 326 Pa.Super. at 159, 473 A.2d at 1029. Subsection (b), "Other Considerations," directs the court to "give primary consideration to the needs and welfare of the child," and notes that a court cannot terminate parental rights solely on the basis of specific environmental factors if those factors are beyond the control of the parents.

Paragraph 2511(a)(5), however, differs from the preceding four paragraphs in section (a) in that it mandates consideration of whether "termination of parental rights would best

serve the needs and welfare of the child" *as part of the grounds for termination.* Paragraph (a)(5) reads:

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time *AND termination of the parental rights would best serve the needs and welfare of the child.*

23 Pa.C.S.A. § 2511(a)(5) (emphasis added).

■ Thus, in termination proceedings based on paragraph (a)(5), such as the one here, the needs and welfare of the child must be considered *twice;* once under subsection (a), and if all five requirements of subsection (a) are met, then again under subsection (b). Before parental rights may be terminated under subsection 2511(a)(5), *each separate element* contained in paragraph five must be *proven. In Re Adoption of B.J.R.,*[15] 397 Pa.Super. 11, 14, 579 A.2d 906, 908 (1990), *citing In Re P.A.B.,* 391 Pa.Super. 79, 570 A.2d 522 (1990), *allocatur granted,* 526 Pa. 649, 585 A.2d 469 (1991). "[T]he fifth factor, whether termination would best serve the needs and welfare of the child, is *not* 'a mere formality flowing from the existence of the preceding four elements' but is instead '*a discrete consideration,*' " *id.,* which must be established by *at least* clear and convincing evidence. *T.R., supra.*

At the April 4, 1991 termination hearing, CYS caseworker Charlotte Huber was questioned about the Matsocks' supervised visits with their children.

---

**15.** In its Adjudication of April 24, 1991, the court cites *B.J.R., supra,* acknowledges that the statute requires proof of the five elements, and reproduces the five elements of the statute precisely as they appear in *B.J.R.* The court then states, "[w]e are convinced beyond any doubt the agency has met its burden the parental rights of the father must be terminated," without ever addressing how termination of Frank's parental rights would best serve the needs and welfare of his children.

Q. Have the children ever indicated that they did not want to have a visit?

A. No, the children like to have their visits.

Q. The children want to have a relationship with their parents?

A. Yes, they do.

Q. The parents, for the most part, want to have a relationship with the children?

A. I believe they do, yes.

The record clearly indicates that a bond of parental affection continues to exist between Frank and Francis and their children. Therefore, it was incumbent upon the court to consider that bond and the effect its destruction would have on the needs and welfare of the Matsock children. 23 Pa.C.S.A. § 2511(a)(5); *J.W., supra; Hamilton, supra.* "[T]he statutory scheme must be strictly complied with." *Michael J.C.,* 326 Pa.Super. at 153, 473 A.2d at 1026, *citing In Re Adoption of E.M.A.,* 487 Pa. 152, 409 A.2d 10 (1979). The court's failure to determine whether "termination of parental rights would best serve the needs and welfare of the child[ren]" as part of the statutory grounds for involuntary termination under section 2511(a)(5), *see* 23 Pa.C.S.A. § 2511(a)(5); *B.J.R.; P.A.B.,* constitutes an error of law.

After a broad and comprehensive review of the record, *T.M.F., supra,* we find that CYS failed to establish each of the five elements of the statutory criteria of section 2511(a)(5) of the Adoption Act by clear and convincing evidence, *T.R., supra; Santosky, supra,* and that the trial court abused its discretion in involuntarily terminating the parental rights of Frank Matsock. *Mielcuszny, supra; Shives, supra.* While we are bound by the trial court's finding, supported by competent evidence in the record, that Frank did not "successfully complete" the sexual abuse therapy programs, *In Re Adoption of J.J., supra,* we are not bound by the court's inference or deduction that Frank is an untreated sexual offender who poses a danger to his children. *J.A.B., supra.* We also conclude the trial court misapplied the law in failing to consider whether the needs

and welfare of the Matsock children would be advanced by the termination of their father's parental rights. *In Re Adoption of J.J., supra; Coast, supra; Michael J.C., supra; Hamilton, supra; J.W., supra; P.A.B., supra.* Therefore, we reverse the decree terminating the parental rights of Frank Leroy Matsock, Sr.

Decree reversed.

ROWLEY, P.J., dissents.