J-S13015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: G.A.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.A.V., NATURAL FATHER | : | No. 1530 WDA 2017 |

Appeal from the Order Entered September 22, 2017
In the Court of Common Pleas of Clarion County
Orphans' Court at No(s):  109 O.C. 2017

BEFORE:  GANTMAN, P.J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MAY 08, 2018**

Appellant, S.A.V. ("Father"), appeals from the order entered in the Clarion County Court of Common Pleas Orphans' Court, which granted the petition of E.H. ("Mother") and M.H. ("Stepfather") for involuntary termination of Father's parental rights to the minor Child, G.A.V. ("Child").  We affirm.

In its opinion, the Orphans' Court fully and correctly set forth the relevant facts and procedural history of the case.  Therefore, we have no reason to restate them.  We add only that on September 22, 2017, after a hearing, the court terminated Father's parental rights.  Father timely filed a notice of appeal and a concise statement of errors raised on appeal pursuant to Pa.R.A.P. 1925(a)(2)(1) and (b), on October 18, 2017.

Father raises the following issues for our review:

> WHETHER THE TRIAL COURT ERRED IN TERMINATING FATHER'S PARENTAL RIGHTS UNDER 23 PA.C.S.A. §

2511(A)(1)?

WHETHER THE TRIAL COURT COMMITTED AN ERROR AND/OR ABUSE OF DISCRETION IN FINDING THAT THE TERMINATION OF FATHER'S PARENTAL RIGHTS WAS IN…CHILD'S BEST INTEREST IN ACCORDANCE WITH 23 PA.C.S.A. § 2511(B)?

(Father's Brief at 6).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super.

2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191-92 (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The petition for the involuntary termination of Father's parental rights to Child implicated the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

- 3 -

> With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."

*In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his… parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

- 4 -

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his… conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his… parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). With respect to an incarcerated parent, this Court has stated:

> [I]ncarceration alone does not provide sufficient grounds for the termination of parental rights. Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and fails to take affirmative steps to support a parent-child relationship. As such, a parent's responsibilities are not tolled during incarceration.

*In re Adoption of K.J., supra* at 1133 (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability

are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond."

*Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a

genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Paul H. Millin, S.J., we conclude Father's issues merit no relief. The Orphans' Court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Orphans' Court Opinion, filed November 21, 2017, at 1-9) (finding: **(1)** Father's testimony was not credible; although Father admitted he failed to visit Child for two months before incarceration, he attempted to blame his

- 7 -

failure to visit Child on Mother; even if Mother had stopped Father's visits, Father is responsible for enforcing his parental rights; while incarcerated from May 2016 to January 2017, Father failed to communicate with Child; Mother did not change her cell phone number until October 2016, five months after Father was incarcerated; Mother credibly testified she provided Father notice of change of her phone number in January 2017; paternal grandmother's testimony contradicted Father's testimony that he could not call Child while incarcerated because he had no money to use phone; Father also testified he did not call Child while incarcerated, because court's July 2016 order precluded him from communicating with Child; Father, however, made no effort at all to communicate with Child and did not write to Child, even though he did not know Mother changed her address until after he was released from incarceration; after he was released from prison in January 2017, Father attempted to communicate with maternal grandparents to locate Mother and Child only *via* Facebook, even though Father had maternal grandparents' phone numbers; Father's use of Facebook belies his statement he could not locate Mother *via* internet because he was unable to use internet; Father's behavior before, during, and after incarceration established Father had settled purpose of relinquishing parental claim to Child and failed to perform parental duties for Child; **(2)** Child and Stepfather are bonded as parent and child; Child is integrated with Stepfather's other children in family unit; Stepfather wishes to adopt Child, and Mother also desired Stepfather to adopt Child).

Accordingly, we affirm on the basis of the Orphans' Court opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2018

Children's Fast Track

**IN THE COURT OF COMMON PLEAS
OF CLARION COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION**

IN RE: G.A.V., a Minor                    NO: 109 OC 2017

Appearances:                                        NOV 2 1 2017
For the Petitioners: Scott A. White, Esq.
For the Respondent: Danielle Melillo, Esquire
For the Child: Cassandra M. Munsee, Esquire

Millin, S.J.                                        November 21, 2017

## OPINION

This opinion is entered to supplement the comments and findings I entered following the hearing which may be found in the Transcript (T.) at pages 119 through 128 (T.119-128).

FINDINGS OF FACT:

1.  G.A.V. (hereinafter "Child") was born        ', 2008. (Petition, para. 2)

2.  E.H. (hereinafter "Mother") is the biological mother of Child. (Petition, para. 1)

3.  S.A.V. (hereinafter "Father") is the biological father of Child. Father was born        1988. Father and Mother had a relationship for about two years before the child was born and separated a few months after the child was born. (Petition, para. 3, T. 44)

4.  M.H. (hereinafter "Stepfather") is the stepfather of Child. (Petition, para 1)

5.  Mother and Stepfather, petitioners in this matter, are asking for the termination of parental rights of the biological father. (Petition, p.1)



6. The Petition for Involuntary Termination of Parental Rights was filed April 17, 2017. (Petition p.1) (T.51)

7. Since 2009, there has been a custody order spelling out the rights of Father and Mother concerning custody of the child. (Court Exhibit 1)

8. Prior to July 27, 2016, the order dated March 7, 2011 stated that the parties would have shared legal custody; that Mother would have primary custody and that Father would have periods of partial custody on alternating weekends from Friday at 6:00 p.m. to Sunday at 6:00 p.m. and in the summer one week in June, July and August. (Court Exhibit 1)

9. Prior to incarceration Mother described Father's visits as "hit or miss". She stated that he would miss two or three visits and then would make several, and then miss some more. When he missed he would not call and cancel, he just would not come. (T. 31) The Court finds this testimony credible. It was partially corroborated by Father's testimony that he missed dates due to their being bench warrants for his arrest for support arrearage. He stated that Mother told him he could not see the child while there was a support deficiency. The Court finds that placing the blame for missing visits on Mother is not credible. Mother testified to a visit in "March or April 2016" at a time when Father was admittedly in arrears and Mother drove to Father's residence to pick the child up after the visit. (T. 20, 21) Mother's testimony was supported by Stepfather. (T. 15)

10. Mother also testified credibly that transportation for custody exchanges was changed from meeting halfway "to doorstep to doorstep, because I was driving halfway to meet him, and he wasn't showing up." (T. 30)

11. Mother stated that the visit in March or April 2016 was Father's last visit, and following it there was no contact at all between Father and the child, no cards, no letters, no gifts, no phone calls and no financial support. (T. 21) Father corroborated that his last visit with the child was around March 2016. (T. 73).

12. Mother testified concerning the last support payment she received, "I received, at our last hearing, a payment, because at our last hearing that we had, he had a bench warrant and to get the--they paid whatever to get the--I don't remember the exact amount. I got a payment then but before that, it'd been over a year since I received a payment, and the payment that I received was like $10, and before that, it'd been quite a distance before that. (T. 32)

13. Father was incarcerated in May 2016 and remained incarcerated in the jail until January "middle to the end", 2017. Father is currently on parole. (T. 48)

14. On July 27, 2016, this court held a hearing on a Petition for Special Relief filed by Mother in the custody matter and issued an order suspending Father's partial custody rights and legal custody rights while Father was incarcerated. The order stated, "Upon his release from incarceration, both his partial custody rights and legal custody rights under the prior court

3

order shall be reinstated, pending further order of the court. (Court Exhibit 1)

15. The charge which resulted in Father's incarceration was "manufacturing drugs out of _____ New Kensington, which was Father's place of residence where he took the child during periods of partial custody." (T.65)

16. At the time of Father's last visit with the child and up until October 2016 Mother and Stepfather resided with the child and their other children at _____ Lucinda, PA. In October 2016 Mother and Stepfather moved to their current residence at _____ Titusville, PA. (T. 29)

17. Mother gave no formal notice to Father of the change of address in October, 2016 as required by Pa.C.S.A. Section 5337. Likewise, Father gave Mother no notice of his change of address either to or from the prison or from his mother's home to his current address. (T.68)

18. Mother did give Father notice when she changed her phone number in early January, 2017. (T. 33 – 34, 36) The envelope which held the notice of the change of phone number showed Mother's new address in Titusville Pennsylvania. (T. 34)

19. When Father was released from prison he made no attempt to contact Mother. He stated "I had no way of reaching out to her. I had no address, phone numbers. I was blocked from all social media, so I couldn't reach out to her in that manner. I had tried reaching out to her parents on Facebook because I didn't have a number for them either. (T. 54) Father

4

stated that he first learned of Mother's change of address when he was released from prison. (T. 55) This assertion was contradicted by the paternal grandmother who testified that she informed Father of the change of address and phone number while he was incarcerated. (T. 96, 97) Father's assertion that he had no contact information for the maternal grandparents is also contradicted by the paternal grandmother's testimony that she had the maternal grandparents house phone number and spoke to them. (T. 97, 98) Father also had the maternal grandparents' home address. It was the address on record with the Clarion County Prothonotary in the custody action, and it had not changed since the custody action started in 2009. The maternal grandparents had lived at the same address for 14 or 15 years (T. 38, 41 – 42) Mother testified credibly that the reason for the change of address was not to make it difficult for Father to find her, but rather because, "our landlord was selling our home, we were outgrowing our home, and we were having plumbing issues that the landlord would not fix because she was selling the home, and we moved into a much bigger house." (T. 24) Father also stated that he could not make any phone calls from prison because he had no money to make calls, "I had no way of reaching out. I had no money on the phones. I couldn't call out." (T. 66) This was also contradicted by his mother who stated that she spoke to him while he was imprisoned on the phone and purchased time for him,

"Q. Did you have communication with your son over the phone in jail?

A. We spoke a few times if he had money on his books.

Q. Who would put money on his books?

A. I had done it a couple of times. His sister-in-law had done it a couple of times. It wasn't something that was done regularly, so we spoke occasionally." (T.103)

The petition to terminate parental rights alleges the grounds for termination in the following terms:

> 5. That the Natural Father in this case has performed parental duties not at all during the last 12 months.
> 6. That the Natural Father in this case has conduct continuing for a period of at least six (6) months immediately preceding the filing of the within Petition and has not evidenced a purpose of parental claim to the child or has refused or failed to perform parental duties. Petition For Involuntary Termination Of Parental Rights Pursuant To 23 Pa.C.S.A. Section 2511, p.3.

This is an allegation under 23 Pa.C.S.A. Section 2511(a)(1) which states:

> (a) General Rule – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

The Pennsylvania Supreme Court has stated regarding the application of section 2511 (a) (1):

> To satisfy Section 2511 (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination....

6

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties. Accordingly parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties. *Matter of Adoption of Charles E.D.M.II,* 550 Pa. 595, 601, 708 A.2d 88, 91 (1998) (citations omitted).

Incarceration of a parent alone will not provide sufficient grounds for termination of parental rights, but "an incarcerated parent's responsibilities are not tolled during his incarceration." *In re D.J.S.,* 737 A.2d 283, 286 (Pa.Super.1999).

Parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *In the Interest of C.S.,* 761 A.2d 1197 (citations omitted).
The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. *In re the Adoption of Dale, A.II,* 453 Pa.Super 106, 683 A.2d 297, 302 (1996).

Once the Court concludes that clear and convincing evidence has been presented that Father has refused or failed to perform parental duties for at least six months prior to the petition for termination or that Father has by his conduct evidenced a settled purpose of relinquishing parental claim for a period of six months prior to the petition for termination, then the Court must determine whether there is clear and convincing evidence that termination of parental rights best serves the needs and welfare of the child.

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child--- the love, comfort, security, and closeness ---entailed in a parent-child relationship, as well as the tangible dimension. *In re Matsock,* 416 Pa.Super. 520, 540, 611 A.2d 737, 747 (1992). "Continuity

7

of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. *In re William*, 477 Pa. 322, 348, 383 A.2d 1228, 1241 (1978). The trial court, "in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *In re P.A.B.*, 391 Pa.Super. 79, 86, 570 A.2d 522, 525-26 (1990), *appeal dismissed*, 530 Pa. 201, 607 A.2d 1074 (1992), *In the Interest of C.S.* ,761 A.2d 1197 (2000 PA Super 318).

As I said in my comments after the hearing, it was the obvious bond between the child and the paternal grandmother which gave me pause. Father's testimony was so lacking in credibility that almost everything he said is questionable. His complete stoppage of visits with the child for two months prior to being incarcerated is admitted, although he attempted to blame it on Mother.

I do not believe Mother stopped his visits, but even if she had, he is responsible for having the intestinal fortitude to enforce his custody rights spelled out in a court order. When he went to jail he admittedly had Mother's cell phone number which would not be changed for months. Mother testified that she changed the phone number after Christmas in 2016 and she tied the change to Stepfather's grandmother being ill and needing a local number to communicate with her.

The paternal grandmother stated the change of phone number occurred in October 2016. Mother tied the change to a conversation with the maternal grandmother concerning events surrounding a birthday. I believe Mother's version to be more credible because I accept her testimony that she sent Father a notice of the change in early January 2017, but even if the change occurred in October, Father would still have had five months into his incarceration when he could have been making calls to his son. His first explanation for not making the calls was that he could not use the phone in jail at all because he had no money, then he used the excuse that the order terminating his custodial and legal custody rights terminated his right to communicate. We know because of the paternal grandmother's testimony that the first explanation is not true. Even if he believed the court order prevented communication, a reasonable father with a

8

continuing and abiding interest in his child would have made an effort. Here there was no effort. He said the reason that he did not send cards or letters was because he did not have an address, but he told us that he did not know that Mother's address had changed until he left the prison. If he had sent cards or letters before the change of address in October 2016, they would have gone to the proper address. If he had sent them after the change of address, Mother had left forwarding instructions at the post office so that the cards or letters would have gotten through. All he needed to do was try.

When he left the prison in January 2017, none of his excuses are viable. Accepting his "understanding" of the court order, his visitation rights were restored. He knew where the maternal grandparents lived and maternal grandmother had their phone number, but he states his only effort at communication with them was through Facebook. He says that he could not use the Internet to help him locate Mother, because he was never able to do anything on the Internet, yet his familiarity with Facebook belies this statement. Father's actions prior to incarceration, during incarceration, and following incarceration established by clear and convincing evidence that Father had a settled purpose of relinquishing parental claim to the child. Father likewise refused and failed to perform parental duties for the same period.

The clear and convincing evidence also shows that the Child and Stepfather are bonded as parent and child; that the Child is integrated with the parent's other children in a family unit, and Stepfather wants to adopt him and Mother wants the adoption to occur.

For the foregoing reasons the court granted the petition to terminate the parental rights of Father.

BY THE COURT:

Paul H. Millin, S.J.

9