J-S28034-20
J-S28035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: M.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.C.-P., FATHER | : | No. 417 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8831

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.C.-P., FATHER | : | No. 418 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8832

| | | |
|---|---|---|
| IN THE INT. OF: E.F.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.C.-P., FATHER | : | No. 419 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8833

J-S28034-20
J-S28035-20

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.A.-B., NATURAL MOTHER | : | |
| | : | No. 429 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8831

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H.C.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.A.B., MOTHER | : | No. 430 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8832

| | | |
|---|---|---|
| IN THE INTEREST OF: E.F.C.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.A.B., MOTHER | : | No. 431 MDA 2020 |

Appeal from the Decree Entered January 31, 2020
in the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8833

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED OCTOBER 26, 2020**

- 2 -

M.C.-P. ("Father") and S.M.A.-B. ("Mother") (collectively, "Parents") appeal from the Decrees entered on January 31, 2020,[1] which granted the Petitions, filed by the Luzerne County Children and Youth Services ("CYS" or the "Agency"), seeking to involuntarily terminate their parental rights to their three minor children, K.H.C.-A. (a female born in October 2014); E.F.C-.A. (a female born in July 2016), and M.C.-A. (a male born in June 2017) (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(8) and (b).[2]  We affirm.

The Children were removed from Parents' care because of domestic violence between Mother and Father in the family home, and inappropriate parental discipline.  K.H.C.-A. and E.F.C.-A. were placed in foster care on October 3, 2016, and M.C.-A. was placed in foster care on June 18, 2017.  On

---

[1] The Decrees were dated January 30, 2020, but the docket reflects that Notice pursuant to Pa.R.C.P. 236(b) was issued on January 31, 2020.  The Notice dates are considered the dates of entry for the Orders.  **See Frazier v. City of Phila.**, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."); **see also** Pa.R.A.P. 108(a) (providing that the entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b).").

[2] On March 30, 2020, the trial court filed one Opinion in this matter, which addressed both Parents' challenges to the terminations of their respective parental rights to each of the Children.  This Court, on March 20, 2020, *sua sponte* consolidated the separate appeals of Mother and Father to the termination of the parental rights to each of the Children, and listed the appeals consecutively.  Thus, we address both Parents' challenges in one Memorandum for ease of disposition.

February 19, 2019, CYS filed Petitions for the involuntary termination of the parental rights of Father and Mother to the Children, and Petitions for permanency review and a goal change hearing. On February 26, 2019, the trial court appointed Joseph Mashinski, Esquire ("Attorney Mashinski"), as the legal counsel and guardian *ad litem* ("GAL") for the Children.[3]

---

[3] At the time of the hearings, K.H.C.-A. was almost five years old, E.F.C.-A. had recently turned three years old, and M.C.-A. had recently turned two years old. The trial court perceived no conflict between the best interests of the Children and their legal interests, and appointed only one counsel to serve as both legal interest counsel and GAL for the Children. *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75 (Pa. 2017) (plurality) (explaining that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding, and that a child's legal interest is synonymous with his or her preferred outcome); *see also In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018) (concluding that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). Here, the trial court did not err in allowing Attorney Mashinski to act as E.F.C.-A.'s and M.C.-A.'s sole representative, as those children were too young to express a preferred outcome. *Id.* Attorney Mashinski interviewed the individuals and their counsel involved in this case, as well as the Children. *See* GAL's Report and Recommendation, dated October 6, 2019 and filed October 7, 2019, at 1 (unpaginated). He represented the Children at both days of hearings and reviewed the transcripts and documents from discovery. *Id.* Attorney Mashinski did not identify a preferred outcome of any of the Children in this matter, nor did he identify any conflict of interest between the Children's best interests and legal interests. *Id.* Rather, he recommended, regarding the Children's legal interests, that the Agency did not meet its burden of proof, and, regarding the Children's best interests, that it was **not** in the best interest of the Children to terminate the parental rights of Mother and/or Father. *Id.* at 7 (unpaginated). It appears from the GAL's report that, based on the testimony of the witnesses at the hearings, Attorney Mashinski believed that the [P]arents had not been inappropriate with the Children and could have been given more time to address their issues. *Id.* at 4-7 (unpaginated).

On August 22, 2019, and September 9, 2019, the trial court conducted evidentiary hearings on the Petitions. CYS presented the testimony of Paul Dorang, a case manager for Family Service Association ("FSA"), Intensive Family Reunification Services ("IFRS"). N.T., 8/22/19, at 9. CYS additionally presented the testimony of Marisue Sack ("Ms. Sack"), a case manager for IFRS, N.T. (Morning Session), 9/9/20, at 6; Chyann Phillips ("Ms. Phillips") (via telephone), a permanency specialist, caseworker, parent educator, and visit coach for "Concern," a foster care agency working with community-based programs for parents, *id.* at 24; Megan Donovan ("Ms. Donovan"), the CYS caseworker for the family, *id.* at 45; Marlene Woods, a facilitator for Family Service Association's Batterer's Intervention Program and Family Group Decision Making, N.T., 9/9/20, at 4 (afternoon session); and Denise Mengak, a licensed clinical social worker for Catholic Social Services ("CSS"), *id.* at 17.

Mother presented the testimony of Ms. Donovan and Keri Stempien. *Id.* at 47, 90.

On January 31, 2020, the trial court entered the Decrees terminating the parental rights of both Father and Mother to the Children, pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b). On February 28, 2020, both Father and Mother timely filed Notices of Appeal and Concise Statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), with regard to each of the Children.

In his brief on appeal, Father raises the following issues:

I. Did the trial court abuse its discretion, commit an error of law, and/or [was] there insufficient evidentiary support in terminating the parental rights of [Father], as the grounds pursuant to 23 Pa.C.S.[A.] § 2511(a)(8) were not established by clear and convincing evidence, and such granting of a [P]etition to terminate parental rights was against the weight of the evidence presented by the parties, including but not limited to whether the conditions that gave rise to the placement of [the Children] continued to exist[?]

II. Did the trial court abuse its discretion, commit an error of law, and/or [was] there [] insufficient evidentiary support for the court's decision that the best needs and welfare of the minor [C]hildren would be served by terminating natural Father's parental rights as required by 23 Pa.C.S.[A.] § 2511(b), including but not limited to the court not evaluating the cultural impact that termination would have upon the minor [C]hildren[?]

Father's Brief at 3-4. Father contends that the trial court erred in terminating his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) because, although he did not complete all of the court-ordered services, the Agency failed to prove by clear and convincing evidence that the specific conditions that led to Children's placement are still present. Father's Brief at 18-20. Father asserts that there was no evidence of persistent domestic violence between the Parents, nor was there any indication of continued inappropriate discipline by either of the Parents. *Id.* at 18 (citing the testimony of Ms. Donovan, N.T. (Morning Session), 9/9/19, at 47). Father emphasizes that Ms. Donovan, Ms. Sack, and Ms. Phillips had never witnessed either of the Parents utilizing inappropriate discipline since the date of the Children's placement. Father's Brief at 19 (citing N.T. (Morning Session), 9/9/19, at 59-60, 13-14, 37). Citing the testimony of Ms. Phillips and Ms. Sacks, Father claims that, although the

Parents did not complete the parenting education program, the reason the Parents were referred to parenting education was because of inappropriate discipline and not for parenting deficiencies. *Id.* at 20. Moreover, Father asserts that the Agency did not present any evidence of domestic violence incidents that occurred from September 2018 through the termination hearings in August and September of 2019. Father's Brief at 19-20. Accordingly, Father contends that the Agency did not meet its burden of proving by clear and convincing evidence that the Parents failed to remedy the reasons for the Children's placement: inappropriate discipline and domestic violence. Father's Brief at 20, 24-25.

Moreover, Father challenges the trial court's determination that termination of his parental rights would best serve the Children's needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b). Father's Brief at 23. According to Father, the record does not support the trial court's determination that the termination of his parental rights would have no detrimental impact on the Children. *Id.* Father relies on the testimony of Ms. Donovan, who testified that termination would be in the best interest of the Children, but that she did not know if there would be a detrimental impact due to cultural issues. *Id.* (citing N.T. (Afternoon Session), 9/9/19, at 68, 72). Father disputes the trial court's finding, by clear and convincing evidence, that termination would have no detrimental impact on the Children. *See* Father's Brief at 14-15, 24-25.

In her brief on appeal, Mother raises the following issues:

I. Whether the trial court abused its discretion, committed an error of law, and/or [was] there [] insufficient evidentiary support for its finding that [Mother's] parental rights should be terminated pursuant to 23 Pa.C.S.A. Section 2511(a)(8)[?]

II. Whether the trial court abused its discretion, committed an error of law and/or there was insufficient evidentiary support for its finding pursuant to 23 Pa.C.S.A. 2511(b) that it is in the best interest of the minor [C]hildren to grant the termination of [Mother's] parental rights[?]

Mother's Brief at 2 (unpaginated). Mother's arguments in support of her claims are similar to the arguments raised by Father.

Mother claims that the trial court committed an error of law and/or abused its discretion in terminating her parental rights to the Children pursuant to section 2511(a)(8) and (b), as there was insufficient evidentiary support for the trial court's decision. Mother's Brief at 9 (unpaginated). Mother asserts that the trial court erred and/or abused its discretion in finding that she did not derive any benefit from the services and, therefore, the conditions that gave rise to placement continue to exist; and the trial court abused its discretion in concluding that it is clearly in the Children's best interest to terminate her parental rights. *Id.* at 2-9 (unpaginated).

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate

- 8 -

courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re:*] *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) [(plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, … 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, … 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, … 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we focus on section 2511(a)(8) and (b). Subsections (a)(8) and (b) provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following three elements must be met: (1) the child has been removed from the care of the parent for at least twelve (12) months, (2) the conditions which led to the removal or placement of the child continue to

exist, and (3) termination of parental rights would best serve the needs and welfare of the child. ***See In re Adoption of R.J.S.***, 901 A.2d 502, 511 (Pa. Super. 2006). Notably, termination under Section 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement. ***Id.***

The focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

> [U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

***R.J.S.***, 901 A.2d at 508.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated the following:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include

> "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.,*** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

- 12 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming the involuntary termination of parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

With regard to the termination of Father's and Mother's parental rights under section 2511(a)(8), the trial court set forth the grounds for termination, and the conditions continuing to exist in its March 30, 2020 Opinion. *See* Trial Court Opinion, 3/30/20, at 5-6. The trial court further addressed the Children's needs and welfare, their bond with Parents, and concluded that termination is in Children's best interests. *See id.* at 23-25 (needs and welfare analysis), 26-27 (best interest analysis pursuant to subsection (b)). Ultimately, the trial court concluded that CYS met its burden of proof regarding the termination of parental rights of Father and Mother, by clear and convincing evidence, as to both section 2511(a)(8) and (b). *See id.* at 4, 28. We agree with and adopt the trial court's discussion set forth in its Opinion regarding section 2511(a)(8), as its credibility and weight determinations are

supported by the evidence in the record, as well as the trial court's analysis and conclusion with regard to subsection (b). *See* Trial Court Opinion, 3/30/20, at 6-28.

To the extent that Father and Mother rely on the progress made on their permanency goals, we recognize the following:

> [T]he application of [subsection] (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*In re I.J.*, 972 A.2d 5, 11-12 (Pa. Super. 2009) (quoting *C.L.G.*, 956 A.2d at 1005) (emphasis in original)).

The mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d at 267 (quoting *In re K.K.R.-S.*, 958 A.2d at 535). However, as our Supreme Court has instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as

bonding." *In re: T.S.M.*, 71 A.3d at 267 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J., dissenting)). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re: Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (quoting *In re K.Z.S.*, 946 A.2d at 763).

Here, the trial court found that, although the Children have bonds with Father and Mother, their need for permanency and stability outweighs that bond. *See* Trial Court Opinion, 3/30/20, at 2. The trial court specifically stated that it placed considerable emphasis on the developmental, physical, and emotional needs and welfare of the Children pursuant to section 2511(b).[4] *See id.*

On the basis of *In re: K.K.R.-S.*, 958 A.2d at 535, and *K.Z.S.*, 946 A.2d at 763, we discern no error of law or an abuse of the trial court's discretion in concluding that the termination of Father's and Mother's parental rights would serve the Children's best interests under section 2511(a)(8) and (b). *See In*

---

[4] We are cognizant of Ms. Donovan's testimony acknowledging uncertainty as to whether Children would suffer any detrimental impact from the terminations, particularly because of the cultural impact of being Hispanic and adopted by non-Hispanic foster parents. *See* N.T. (Afternoon Session), 9/9/20, at 68, 72. However, Ms. Donovan testified that she did believe that the terminations of the Parents' parental rights, and the adoptions by the foster parents, would be in the Children's best interests because of the permanency and stability it would provide the Children, who are well-bonded with the foster parents. *Id.*

*re: T.S.M.*, 71 A.3d at 267. As the trial court properly acknowledged, although Father and Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See* Trial Court Opinion, 3/30/20, at 27 (citing *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010); *see also In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). A "child's life simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010) (citation omitted). Accordingly, we affirm the termination Decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2020

| | | |
|---|---|---|
| IN RE: | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| M.C.A., | : | ORPHANS COURT DIVISION |
| K.C.A. and | : | |
| E.C.A., | : | NO. A-8831 |
| | : | 417 MDA 2020 |
| Minors | : | |
| | : | NO. A-8832 |
| Appeal of Father | : | 418 MDA 2020 |
| | : | |
| | : | NO. A-8833 |
| | : | 419 MDA 2020 |

RECORDED
03/30/2020 9:39:24 AM
JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
PENNSYLVANIA
Inst Num: 202016107

| | | |
|---|---|---|
| IN RE: | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| M.C.A., | : | ORPHANS COURT DIVISION |
| K.C.A. and | : | |
| E.C.A., | : | NO. A-8831 |
| | : | 429 MDA 2020 |
| Minors | : | |
| | : | NO. A-8832 |
| Appeal of Mother | : | 430 MDA 2020 |
| | : | |
| | : | NO. A-8833 |
| | : | 431 MDA 2020 |

## MEMORANDUM ISSUED PURSUANT TO PA.R.A.P. 1925(a)

## I.   PROCEDURAL HISTORY

On February 19, 2019, Petitioner, Luzerne County Children and Youth Services (Children and Youth), filed Petitions for the Involuntary Termination of Parental Rights (Petitions) of the natural parents for the minor children, M.C.A., K.C.A., and E.C.A., in addition to conducting a permanency review and a goal change hearing before the Court.

Hearings were held on August 22, 2019 and on September 9, 2019.

On January 30, 2020, this Court issued decrees terminating the parental rights of both natural Father and natural Mother. Both Mother's and Father's parental rights were terminated pursuant to 23 Pa.C.S.A. §2511 (a)(8). In entering these termination decrees, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the children pursuant to 23 Pa.C.S.A. § 2511(b). Both Mother and Father, by and through their Court-Appointed Counsel, filed a Notice of Appeal to the Superior Court and the requisite Statement of Matters Complained of on Appeal.

Mother's Statement of Matters Complained of on Appeal is as follows:

1. The Trial Court abused its discretion, committed an error of Law, and/or that there was insufficient evidentiary support for its finding that Appellant's parental rights should be terminated pursuant to 23 Pa.C.S.A. §2511 (a)(8).

2. The Trial Court abused its discretion, committed an error of law, and/or there was insufficient evidentiary support for its finding pursuant to 23 Pa.C.S.A. §2511 (b) that it is in the best interest of the minor children to grant the termination of Appellant's parental rights.

3. Appellant reserves the right to amend this document within a reasonable time after review of the transcripts.

Father's Statement of Matters Complained of on Appeal is as follows:

1. The Trial Court abused its discretion, committed an error of law, and/or there was insufficient evidentiary support in terminating the parental rights of the Natural Father of M.A., K.A., and E.A., as the grounds pursuant to 23 Pa.C.S.A.§2511 (a)(2)(sic) were not established by clear and convincing

2

evidence, and such granting of a petition to terminate parental rights was against the weight of the evidence presented by the parties.

2. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidentiary support for the Court's decision that the best needs and welfare of the minor children, M.A., K.A. and E.A. would be served by terminating Natural Father's parental rights as required by 23 Pa.C.S.A.§2511(b)

3. Counsel for Natural Father reserves the right to amend this document within a reasonable time after receipt of the final transcript and/or the Trial Court's Opinion in Support of the January 30, 2020 Decree.

The Court notes that the Appellant, Father, in paragraph (1) of his Statement of Matters Complained of on Appeal, alleges that the court erred in terminating the Father's parental rights pursuant to 23 Pa.C.S.A.§2511 (a)(2). However, in this case, the Court issued only issued a decree based on Title 23 Pa.C.S.A. §2511 (a)(8). The Court did not terminate Father's parental rights pursuant to 23 Pa.C.S.A.§2511 (a)(2).

Therefore, this Court will address the termination of Father's parental rights based on Title 23 Pa.C.S.A. §2511 (a)(8) and further how the best interests of the children were considered by the Court.

## II. FINDINGS OF FACT

There are three children in this case. The minor child, K.C.A.'s, date of birth is October 7, 2014; M.C.A.'s date of birth is June 15, 2017 and E.C.A.'s date of birth is July 7, 2016. N.T. 09/09/19 at 45. The date of placement for K.C. A. and E.C. A. was October 3, 2016 and the date of placement for M.C. A. was June 18, 2017. The reason for placement was inappropriate parental discipline upon the children and domestic

3

violence between the parents. *Id.* at 46. This case involves the proposed termination of Mother's parental rights and Father's parental rights.

In meeting its requisite burden of proof by clear and convincing evidence regarding the termination of parental rights of Mother and parental rights of Father, Petitioner offered the testimony of Paul Dorang, case manager for Family Service Association, specifically Intensive Family Reunification Services (IFRS); Marisue Sack, case manager for IFRS; Chyann Phillips, permanency specialist, caseworker, parent educator and a visit coach for "Concern", a foster care agency working with community-based programs for parents; Megan Donovan, caseworker for Luzerne County Children and Youth; Marlene Woods, facilitator for Family Service Association's Batterers' Intervention Program and Family Group Decision Making; and Denise Mengak, licensed clinical social worker for Catholic Social Services.

## III.  CONCLUSIONS OF LAW

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) The agency has shown by clear and convincing evidence that the parental rights of the Mother and Father, to the minor children, M.C. A., K.C.A., and E.C.A., may be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(8).

(2) The agency has shown by clear and convincing evidence the termination of the parental rights of Mother and Father, to their minor children, M.C.A., K.C.A., and E.C.A., best serves the needs and welfare of the children pursuant to 23 Pa. C.S.A. Section 2511(b).

## IV.    DISCUSSION: GROUNDS FOR TERMINATION

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. A parent who cannot or will not meet the requirements within a reasonable time following the intervention by the State may properly be considered unfit and may properly have his or her rights terminated. *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa. Super. 2002).

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 820 A.2d 774 (Pa. Super. 2003), (*citing In the interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

### A.    23 Pa. C.S.A. Section 2511 (a)(8)

A Court may terminate parental rights under Section 2511(a)(8) when:

The child has been removed from the care of the parent by the Court or under voluntary agreement with an agency, twelve (12) months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

Under 23 Pa.C.S.A. Section 2511(a)(8), the agency must show: (1) The child has been removed for at least twelve (12) months, (2) The conditions that gave rise to placement continue to exist, and (3) Termination of parental rights would best serve the needs and welfare of the child.

Title 23 Pa. C.S. 2511(b) "Other Considerations" states that when a petition is filed pursuant to subsection (a)(8), the court shall not consider any effort by the parent to remedy their condition subsequent to the filing of the petition to terminate the parent's parental rights. As stated above, the petitions to terminate Mother's parental rights and Father's parental rights were filed on February 19, 2019.

(1) **TIME PERIOD OF REMOVAL OF CHILD**

It is undisputed that the minor children, K.C.A. and E.C.A. were removed from the custody of Mother and Father on October 3, 2016 and M.C.A. was removed from the custody of Mother and Father on June 18, 2017. N.T. 09/09/19 at 46 (morning session). Accordingly, this removal has persisted well in excess of the statutorily required twelve (12) months since the date of the children's placement. Thus, the requisite minimum of at least 12 months from removal of minor children from Mother and Father has elapsed so as to comply with this section of 2511(8).

(2) **CONDITIONS CONTINUING TO EXIST**

It is clear from the testimony of witnesses and evidence presented that Mother and Father have been unable to remedy their domestic violence with one another and their parenting concerns-- posing a significant impact and safety risk upon the minor children. Mother also did not complete required mental health services and Father never completed a required Batterer's Intervention Program.

Ms. Megan Donovan testified that she is employed at Luzerne County Children and Youth as a caseworker. She testified that she is the caseworker for the minor children and she has worked with the minor children for two (2) years. *Id.* Ms. Donovan testified that the date of placement for K.C.A. and E.C.A. was October 3, 2016 and the date of placement for M.C.A. was June 18, 2017. The reason for placement was inappropriate parental discipline and domestic violence between the parents. Ms. Donovan further explained that Mother was accused of inappropriate discipline of her oldest child, Diego. Mother was indicated for physical abuse of Diego, who has been returned to his biological father. Luzerne County Children and Youth received referrals that Mother's physical discipline resulted in Diego incurring bruises from the use of Mother's hands and belts. (See Petition to Terminate Mother's and Father's Parental Rights filed on February 19, 2019) As a result of that incident, the two children, K.C.A. and E.C.A. were removed from the home and placed into foster care. The reason for the placement of M.C.A. was due to the Mother and Father not actively engaging in services, in addition to concerns of domestic violence. N.T. 09/09/19, Pg. 46-47, 58. (morning session)

At the time of placement of the three minor children, Children and Youth had concerns addressing parenting abilities and mental health issues. The Family Service Plan was adopted as a court order. As part of the order, the parents were to participate in an evaluation by a clinical psychologist, Dr. Lenora Hermann Finn, and comply with all recommended services. They were additionally required to complete a mental health evaluation and parenting education program. According to Ms. Donovan, Mother participated in Dr. Finn's evaluation; however, she did not complete a mental health evaluation, nor did she complete a parenting education program. Ms. Donovan stated

7

that she learned at the September 2018 hearing that Mother completed a domestic violence evaluation. *Id.* at 47-48.

Ms. Donovan testified that prior to February 19, 2019, the filing date of Mother's and Father's petitions to terminate their parental rights, Mother completed Dr. Finn's evaluation. Dr. Finn recommended that Mother participate in marriage counseling. However, Mother did not complete a marriage counseling course, nor did she complete a parenting education course prior to February 19, 2019. *Id.* at 49.

Ms. Donovan testified that during the two years that she had the case, she was not able to refer Mother for a mental health evaluation because Mother would not sign a release, and therefore she was unable to do a referral for Mother. Ms. Donovan stated that she asked Mother multiple times to sign the releases; however, Mother would not sign the releases. Ms. Donovan confirmed that the court did order the Mother to complete a mental health evaluation. *Id.* at 66.

As part of the Family Service Plan, Father was also recommended to complete Dr. Finn's evaluation, in addition to a separate mental health evaluation and a Drug and Alcohol evaluation. Father was ordered to complete a Batterer's Intervention program in October 2018. Father completed his mental health evaluation in November 2017. There were no mental health services recommended for Father.

Father did complete a Drug and Alcohol program with Catholic Social Services in March 2018. With respect to Batterer's Intervention, Father was referred to Family Service Association (FSA). However, Father did not complete the Batterer's Intervention program prior to the filing of the petition to terminate his parental rights on February 19, 2019. He had an intake in October 2018 and did not return after the intake. Father also did not successfully complete any parenting education program prior to Children

8

and Youth filing the petition to terminate his parental rights. Father only engaged in a few sessions of the parenting education program. *Id.* at 49-50.

Ms. Donovan testified that Mother and Father engaged in marriage counseling for up to twelve (12) sessions. The parents were making progress, but then they stopped going. They re-engaged in September or October of 2018. Ms. Donovan testified that the parents were both told that they needed to engage in and complete the family service plan in order to be reunified with their children. *Id.* at 50. Ms. Donovan testified that since the placement of the children, there continued to be domestic violence issues between the parents up until September 2018. At the September 2018 hearing, Mother served Father with a Protection from Abuse Order. Ms. Donovan stated that an incident took place involving violence between the parents and Mother filed a Protection from Abuse Petition against Father. *Id.* at 51- 52. Ms. Donovan testified that there were prior incidents between the date of the placement of the children and September 2018. Mother had accused Father of hitting her, arguing with her and throwing things. Ms. Donovan stated that both parents were the aggressors during their domestic disputes. Ms. Donovan testified that from the review of the documents it would seem that Mother was the victim and Father was the perpetrator; however, based on Ms. Donovan's observation, she has seen Father with scratches on his face apparently caused by Mother. *Id.* at 51-52. Ms. Donovan testified that she had concerns with the reunification between parents and the children because the parents did not complete the parenting program prior to the filing of the petition to terminate their parental rights. In this case, the parenting program was a very important component due to the domestic violence issues and inappropriate discipline toward the children. *Id.* at 54. Ms. Donovan testified that K.C.A. and E.C.A. have been in placement for three (3) years and M.C.A.

9

for two (2) years. Ms. Donovan stated that there were always domestic violence issues between the parents throughout the life of the case. According to Ms. Donovan, the parents originally were open and honest with reporting their domestic disputes to her; however, once the parents realized that these domestic issues were preventing them from reuniting with their children, the parents refrained from reporting their domestic disputes. Ms. Donovan was concerned that should the domestic issues continue, the parents would not seek help which would have an impact upon the safety of the children should reunification occur. *Id.* at 54-55.

Ms. Donovan testified on cross-examination that she had observed approximately ninety (90%) percent of the visits between the parents and the children in a controlled setting. Ms. Donovan testified that over the course of two years she had never seen the parents use inappropriate discipline toward the children. Ms. Donovan stated that although the parents do use appropriate discipline during their supervised visits with the children, she still has concerns in light of recent domestic disputes between the parents. *Id.* 58-60. Ms. Donovan confirmed that the last documented domestic violence issue between the parents was in September 2018. *Id.* at 56-57, 61.

Ms. Donovan testified that throughout the placement of the children there was a period of time that the visits were not supervised subsequent to "visit coaching" being successful. However, a domestic dispute occurred between the parents in 2017 and the visits were returned to the agency. The incident took place prior to Ms. Donavan acquiring the case. The domestic violence incident involved a physical altercation when the children were not in the home. *Id.* at 72. Ms. Donovan testified that there was a second incident involving domestic violence when the parents had unsupervised visits with the children in August 2018.

10

At the time, the parents had successfully completed one unsupervised session in the home alone with the children. Prior to the second scheduled unsupervised visit, another physical altercation took place between the parents. The visits were then returned to the agency and were supervised. Since that time, the parents' visits with the children have remained supervised at the agency. Ms. Donovan testified that throughout the life of the case, there has been continued domestic violence incidents in the home between the parents while the children were not in their care. *Id.* Father also had reported one of the incidents, stating that Mother was "out of control" and threw a **pot of hot coffee, across the room at Father.** (emphasis added) (See Petition for Termination of Parental Rights filed on February 19, 2019).

Ms. Marisue Sack testified that she is employed at Family Service Association as a case manager in the Intensive Family Reunification Services program. Ms. Sack explained that the program's goal is to achieve family reunification. Ms. Sack further stated that she received a referral from Luzerne County Children and Youth for the parents to engage in the program. Ms. Sack indicated that she was Mother's and Father's case manager in the parenting program.

Ms. Sack testified that she began working with the parents in February 2017. She stated that the established goals for the parents were: 1) knowledge of appropriate discipline; 2) effective communication skills, which included discussing domestic violence; and 3) child development. Ms. Sack testified that based on her observation, the parents did well with the child development skills and being attentive to the children during the supervised visits. Ms. Sack explained that she was still working with the parents on their communication skills, specifically with respect to the domestic violence issues between them. *Id.* at Page 7-8.

11

Ms. Sack further testified that during the time that she worked with the parents, there was a protection from abuse order in May 2017. Ms. Sack stated that for a brief period, she was meeting with the parents separately. She stated that she was aware that there were other protection from abuse orders; however, she was not aware of the dates of the orders. *Id.* at 11.

On cross-examination, Ms. Sack testified that she met with the parents seven (7) times for the parenting sessions between February 2017 and July 2017. She also observed twelve (12) visits between the parents and the children. *Id.* at 12. Ms. Sack testified that when the case was referred to the IFRS parenting program, the Children and Youth caseworker expressed concern regarding Mother using inappropriate discipline of her older child who was not involved in the IFRS case. *Id.*

Ms. Sack testified that during the parenting sessions, she discussed the inappropriate discipline with the parents. She testified that she explained alternative forms of discipline, other than physical discipline. *Id.* at 13. Ms. Sack stated that pursuant to her observations, the parents used alternate forms of discipline and no physical discipline was used toward the children during the time of supervised visitation. *Id.* at 14.

Although Ms. Sack testified that she did not have any concerns with the parents understanding different forms of discipline, she stated that Mother maintained that her older child lied about what occurred and would not accept responsibility for her actions. *Id.* at 13, 20.

Ms. Sack testified that in July 2017, she specifically advised the parents that should domestic violence continue between them, she could not recommend that the children return home under those circumstances. Ms. Sack testified that as of July 2017

12

there were still ongoing issues. For instance, in July 2017, Ms. Sack arrived at the parents' home at which time the parents came outside on to the porch. Ms. Sack discovered that a domestic incident had occurred between the parents. According to Ms. Sack, the parents were both visibly upset. Mother was crying and accusing Father of lying. Ms. Sack observed fresh scratches on Father's face. *Id* at 9. Ms. Sack stated that the parents refused to disclose to her what occurred between them. *Id.* at 15.

After that incident, Ms. Sack explained that she was attempting to schedule another parenting session with the parents and exchange e-mails with them. However, Mother then requested another parenting worker to work with them. At that time, Ms. Sack testified that although the parents did well with the understanding of child development, the parents did not complete the parenting program. Thus, in August 2017, the parents were transferred to another parenting worker. *Id.* at 10. Prior to Ms. Sack leave the case, she specifically told the parents that she could not recommend sending the children home because of her concerns regarding domestic violence between the parents. *Id.* at 11.

Ms. Sack stated that Father accepted responsibility for the reasons for placement of the children; however, Mother would not accept the responsibility. *Id.* at 20. Ms. Sack testified that she still had concerns with the continued domestic violence in the home. She explained that the children would potentially have to witness the parents fighting either verbally or physically and she was concerned whether that violence would ever be directed toward the children in the home. *Id.* at 21.

Mr. Paul Dorang testified that he is also employed at Family Service Association as a case manager in the Intensive Family Reunification Services (IFRS) parenting education program. Mr. Dorang reiterated that the goal of IFRS is to achieve

13

reunification between parents and their children. N.T. 8/22/19 at 9. Mr. Dorang testified that both Mother and Father were referred to the IFRS program in January 2017 and Mr. Dorang began working with the parents in September of 2017. *Id.* at 10, 13. Mr. Dorang testified that the goals for the natural parents were to 1) be aware of the appropriate discipline toward the children --which was one of the initial reasons for placement; 2) to gain knowledge of child development, including milestones and age appropriate activities; and 3) understanding the importance of good personal decision making between both of the parents, in light of their unhealthy relationship with one another. *Id.* at 11.

Mr. Dorang explained that Mother and Father had many domestic violence issues. There were also alleged violations of the protection from abuse orders between Mother and Father. *Id.* at 12. According to Mr. Dorang, the police had to be called to the parents' residence on more than one occasion. *Id.*

Mr. Dorang testified that with respect to the first goal pertaining to the discipline of the minor children, he worked more with Father than Mother because Mother did not take any accountability or recognize any fault with her parenting. Mr. Dorang stated that Mother was provided with an interpreter for the sessions as English is not her native language. However, Mother would leave the parenting sessions with the interpreter in the room because she did not agree with what was being discussed in the counseling sessions. *Id.* at 14.

Mr. Dorang testified that he talked with the parents and attempted to show them redirection with the children, for example placing the children in "time out" as an effective form of discipline. Mr. Dorang explained that he was not able to complete his task as Mother refused to admit that she was wrong or see any fault with her parenting.

14

Thus, Mother would abruptly leave the parenting session before it was completed. Father, however, stayed for the sessions. *Id.* at 14.

With respect to learning about age appropriate activities or expectations in the context of child development, Mother had to learn to implement a revised parenting structure due to the children's age. For example, Mother was told not to scream, yell, or use any physical discipline ----which was the initial reason for placement. *Id.* Mr. Dorang testified that Mother unfortunately chose to focus her time in the sessions on arguing, complaining, and walking out of the visits to complain to the case aids and caseworkers at the agency. *Id.* at 19.

Mr. Dorang stated that while during his observation he did not observe Mother behaving inappropriately toward the children, he noted that Mother did not interact with the children during the visits and that she failed to take any accountability for any issues leading to placement. *Id.* at 40.

Mr. Dorang testified that the parents were not consistent with him in the program. There was minimal contact from October 12, 2017 to November 7, 2017. For instance, if Mr. Dorang had a session scheduled or if there was a visit, the parents would call the agency and would not call Mr. Dorang. *Id.* at 46. The parents were also inconsistent in staying for the entire visit and would leave the visits early. *Id.* at 47.

According to Mr. Dorang, it was Mother who did not achieve the goal of addressing the discipline concerns with the children, despite the fact that Father did. However, Mother and Father presented as a couple with no plans of separating and so the couple could not receive a favorable report if one parent succeeded and the other did not.

Father reported to him that his relationship with Mother was "going downhill" and that he wanted to leave Mother. However, despite Father's words, Father would not leave Mother. Therefore, Mother and Father continued to present themselves as a couple for parenting education sessions. *Id.* at 15. As Mother refused to cooperate in the sessions, Mr. Dorang told Father that he would continue his sessions with him if he did not stay with Mother. Mr. Dorang stated he was concerned about Father's choice to continue his relationship with Mother. *Id.* at 42. Mr. Dorang testified on cross-examination that Father was told in numerous meetings in December of 2017 that the case would be closed in December if Father did not continue parenting sessions as an individual, rather than as a couple. Mr. Dorang stated that Father was also similarly advised by the prior caseworker., Ms. Sack. *Id.* at 44.

Mr. Dorang explained that Father had a good chance of having the children returned to him as he was appropriate with the children. However, as a couple, return of the children would not be appropriate. Mr. Dorang stated that Father did not understand or refused to recognize the severity of the issues with respect to Mother and therefore stayed with Mother. *Id.* at 15-17. Therefore, Father did not complete the program individually and separate from Mother. *Id.* at 17.

Mr. Dorang explained that Father could have left with the children or at least acquired independent help for the children and attempt to work on his relationship with Mother at a later time. Father was not told to permanently leave Mother, but at the time that the parents were receiving parenting sessions, Mother refused to get any help. *Id.* at 48.

Mr. Dorang testified that during the parent's involvement with the IFRS program, an incident occurred at the parent's home causing the police to come to the home to resolve

16

the domestic dispute between the parents. *Id.* at 20. As a result of the domestic dispute between the parents, the visits with the children began taking place at the Children and Youth office. *Id.* 21. Mr. Dorang stated that the visits initially began at the agency, moved outside the agency, and then returned again to the agency in November of 2017. *Id.* 20. Therefore, according to Mr. Dorang, Mother and Father did not successfully complete the IFRS parenting program during his involvement with them. Thus, on December 22, 2017, Mr. Dorang closed the parents' case due to the parents' failure to make progress as a couple, and the parents' lack of insight. Specifically, it was Father who failed to see the severity of Mother's lack of accountability for her actions toward the children. According to Mr. Dorang, Mother failed to see the faults in her parenting and unfortunately, was not willing to accept any help in order to improve her parenting style. Mr. Dorang explained that in addition to Mother not being accountable for her actions and for Father failing to see the severity of her actions, domestic violence continued to occur between Mother and Father at their residence. *Id.* 21-22.

Ms. Chyann Phillips testified that she's employed with "Concern", a foster care agency that works with community-based programs for parents. Ms. Phillips testified that she does casework, parent education, visit coaching and also works as a permanency specialist. Ms. Phillips testified that she worked with the parents on two occasions in a parenting education program. Ms. Phillips indicated that she first met with the parents on October 22, 2018. Ms. Phillips testified that she established goals for the parents in the program. The first objective was family safety. The second objective was for the parents to work toward in-home reunification visits. The third objective was ultimate reunification. *Id.* at 26. Ms. Phillips testified that she met with the parents at home on October 17, 2018 and she reviewed the parenting program with them. *Id.* 28.

17

Ms. Phillips testified that she met with the parents the second time on October 22, 2018 at the parents' home. During that time, she conducted a parenting inventory which consisted of a domain test focusing on nurturing, discipline, power and empathy. *Id.* 29. Ms. Phillips testified that the parents did not show any deficiencies from the domain test and their scores were average and above average. *Id.* at 30, 42. Following the October 22, 2018 meeting, Ms. Phillips scheduled another meeting with the parents on November 1, 2018. However, the meeting was canceled because Mother was ill. Ms. Phillips stated that subsequent to that time, she was unable to reach Mother and Father. The translator finally was able to contact the parents on November 28, 2018. Mother then indicated to the translator that she had "too much going on" because of the holidays and wanted to delay her parenting classes until after December 2018. Ms. Phillips indicated that Concern does not suspend services simply because a parent is busy. *Id.* at 31, 39. Therefore, the parents were terminated from the program on November 29, 2018 in light of the parents' lack of compliance with the program. Ms. Phillips stated that the parents' goals were not able to be achieved in the program. *Id.* at 32.

Ms. Phillips testified on cross-examination that she worked with the family as a visit coach in which she was able to observe visits between the parents and children between July 2017 and October 2017. *Id.* at 36. Ms. Phillips testified that during that timeframe she did not observe the parents using any inappropriate discipline with the children. Father played educational games with the children and the Mother prepared meals for them. *Id.* at 37. Ms. Phillips testified that the parents did not argue with one another during the visits and they put the children first before themselves. Ms. Phillips then stated that she recommended unsupervised visits. *Id.* at 37-38. Then in October

18

2018, Ms. Phillips received a referral from Children and Youth and she was then a parenting instructor for the parents during that time as opposed to a visit coach. *Id.* at 38.

Ms. Phillips explained that the visit coaching program and the parenting education program are two different programs. Although the parents completed the visit coaching program in 2017, the parents did not complete the parenting education program in 2018. *Id.* at 43-44.

Ms. Marlene Woods testified that she is also employed at Family Service Association of Northeast Pennsylvania. Ms. Woods testified that Father participated in an assessment in the Batterers Intervention Program. Ms. Woods indicated that she received a referral from Children and Youth on September 20, 2018. Ms. Woods described the Batterers Intervention program as a thirty (30) week program which addresses men who use violence in relationships. N.T. 09/09/19 at 4-5 (afternoon session). Ms. Woods explained that the thirty (30) week program consists of ten (10) themes with each theme covered over a three (3) week period. Ms. Woods stated that Father's intake assessment occurred on October 10, 2018. *Id.* at 5. Ms. Woods testified that Father was very vague in his self-assessment and did not answer many questions. According to Ms. Woods, Father indicated that Mother, on occasion, sought outside help due to domestic violence. *Id.* at 6-7.

Ms. Woods testified that each weekly session lasted for a two (2) hour period. Father only attended two sessions on October 15, 2018 and October 22, 2018. Subsequent to these two sessions, Father no longer returned for any additional sessions. Therefore, Father was closed out of the program due to noncompliance. *Id.* at 7-9.

Ms. Woods acknowledged that the referral from Children and Youth was for either Batterers Intervention or Anger Management services based upon the results of Father's assessment. Ms. Woods recommended the Batterers Intervention program for Father because the Anger Management program does not address domestic violence and the Batterers Intervention program addresses the topic. *Id.* at 11-12.

Ms. Denise Mengak testified that she is employed at Catholic Social Services, which offers many community services, including counseling. Ms. Mengak testified that she is a licensed clinical social worker who conducts adult, family, and marriage counseling. Ms. Mengak testified that she provided marriage counseling to Mother and Father from August 2017 through October 2018. *Id.* at 17-18. Ms. Mengak testified that she received a referral from Luzerne County Children and Youth stating that there was "fighting in a relationship and domestic squabbles". Ms. Mengak testified that the goals established were for the parents to 1) improve communication with one another; 2) to be more sensitive to each other's needs; and 3) to refrain from throwing things at one another or breaking things or pushing furniture in the home. *Id.* at 19. Ms. Mengak testified that she met with the parents on a weekly basis for a total of twenty (20) sessions and she also had two individual sessions with each parent. *Id.* at 20-21.

When asked whether any domestic disputes occurred between the parents while she was counseling the parents, Ms. Mengak testified that in December 2017, Father returned home and discovered that he was locked out of the home. Father then became angry, broke the window, entered the home, consumed alcohol and items in the home were destroyed. Ms. Mengak stated that the parents contacted her and reported what had occurred. Ms. Mengak then conducted a session with the parents and Father was

20

referred for a Drug and Alcohol Evaluation after which no further intervention was recommended. *Id.* at 22.

Ms. Mengak testified that in October 2018, she terminated the sessions with the parents. Ms. Mengak explained that another domestic dispute occurred at the parents' home in which furniture was knocked over in the home. According to Ms. Mengak, neither parent was willing to accept responsibility for their actions or relate honestly as to what occurred. Ms. Mengak testified that she was not able to help Mother or Father if they were not honest with her. She stated that the furniture was turned over, yet no one wanted to be accountable. *Id.* at 21-23.

In light of the October 2018 domestic violence incident between the parents and their lack of taking responsibility for their actions, Ms. Mengak believed that she could no longer provide effective services to the parents. Ms. Mengak believed that the parents remained in need of individual counseling and if they chose to remain together, they would need relationship counseling. *Id.* 23-24. Thus, Ms. Mengak testified that the parents did not successfully complete marriage counseling. *Id.* at 25.

Ms. Mengak testified that some of the stressors in counseling were the differences in the parents' personalities as individuals. Ms. Mengak stated that the differences between the parents made them not compatible with one other. *Id.* at 29-30. Ms. Mengak testified that Father was worried that if he left home with the children that he would not be able to handle three active children all at once. However, Ms. Mengak stated that she advised Father that in the event that did occur, he would need to ask for more support in order to further develop his parenting skills. *Id.* at 30-31.

The court finds that based upon the testimony of various witnesses, the parents acted appropriately during their supervised visits. However, at the time of the hearing

21

addressing termination of parental rights, the parents' contact with their children remained on a supervised basis, despite attempts to move to unsupervised contact. Sadly, each attempt to move closer toward reunification was thwarted by the persistence of domestic violence between the parents and their inability to remedy it despite the intervention of various service providers. The testimony is replete with references to incidences of domestic violence, protection from abuse orders, a failure of either parent to take responsibility for actions and a refusal to receive assistance in addressing the issue. Moreover, Father failed to leave a troubled relationship despite being advised by more than one individual that the prospect of having his children reunited with him required him to separate from Mother. His choice is painful, but clear. Mother's choices are equally painful, but clear.

At the time of hearing, the parents were unable to remedy the conditions that have rise to placement within the statutorily required period of twelve months. The Agency attempted to help this family fulfill the objectives of the Family Service Plan through multiple and repeated attempts. There were multiple referrals for parenting education and three witnesses at trial who each attempted to help the family successfully receive parenting education. One witness attempted to assist Father with domestic violence issues and one witness attempted to assist the couple.

Ms. Donovan testified on cross examination that between September 2018 and the date of filing of the petition to terminate on February 19, 2019, there were no reported incidents of domestic violence between the parents. *Id.* at 65. The court does not find the nonreporting of incidents of domestic violence to be reliable. Both Ms. Sack and Ms. Mengak testified that the parents stopped reporting the incidents of abuse in fear that they will be not be reunited with their children. As stated above, the parents

22

were twice given the opportunity to have unsupervised contact at their home. Despite receiving that opportunity, the parents continued to engage in domestic violence. Luckily, the children were not at the home.

The Court finds that the conditions that led to the children's removal from Mother's care and Father's care and into placement were the parents' inability to consistently refrain from domestic violence in the home and the prior injury of a child not at issue in these proceedings. The Court has performed the above extensive analysis in taking testimony and finding credible evidence in concluding that Mother and Father failed to derive any benefit from the services. Therefore, the conditions that gave rise to placement continue to exist.

## (3) **NEEDS AND WELFARE OF THE CHILD**

The term "needs and welfare" of a child refers to both tangible and intangible needs. The intangible needs of a child include love, comfort, security and closeness. *In re Matsock*, 416 Pa. Super. 520, 611 A.2d 737, 747 (1992).

Parental duty is best understood in relation to the needs of a child. These needs, both physical and emotional, cannot be met by a mere passive interest in the development of the child. Meeting a child's needs is a positive duty that requires affirmative performance. *In re Shives*, 363 Pa. Super. 225, 525 A.2d 801, 802 (1987).

A parent is not relieved of his or her responsibility relating to the needs of a child when a child has been placed in foster care. A non-custodial parent has a duty to exert himself to take and maintain a place of importance in the child's life. *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 501 A.2d 648 (1985). A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975).

Moreover, a parent with a child in foster care has an affirmative duty to work toward the return of the child. *In Re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978).

When considering the needs and welfare of the child, it is also important for the court to consider the bond between the parent and the child because severance of a strong parental bond can have a detrimental impact on the child. *Matsock*, *supra.*

Petitioner presented credible testimony regarding the needs, welfare and best interest of the minor children, K.C.A., E.C.A. and M.C.A. Ms. Donovan testified that the two girls K.C.A. and E.C.A. were placed with one foster family and the minor child, M.C.A. was placed with another foster family. N.T. 09/09/19 at 61. Ms. Donovan testified that the children are assimilated into their families. There are pictures of the children in the home and the children are included in all family functions. The children go on vacations with the family and the family celebrates birthdays and other gatherings with the children. *Id.* at 62. Both families wish to adopt the children. Both families are aware that if they are to adopt the children, the children would have all rights of biological children to them and would inherit from their estate. Ms. Donovan testified that she has no concerns whatsoever should the children be adopted by the respective families.

Ms. Donovan testified that the children's physical needs are met by the foster parents. The foster parents provide adequate and regular medical and dental care to the children, in addition to providing housing, stability and consistency. *Id.* at 63.
Ms. Donovan testified that the foster parents also meet the children's developmental needs. With respect to the girls, K.C.A. and E.C.A., they have many educational toys and learning activities. They attend educational trips and go to museums. With respect to the minor child, M.C.A., he also has educational toys and videos. The foster parents read

24

to him daily and he attends day care where he's able to interact with other children his own age.

Ms. Donovan testified that the foster parents also meet the children's emotional needs. The girls, K.C.A. and E.C.A., are very much loved by the foster parents. The foster parents show affection to both girls and they listen to the girls, in addition to encouraging them to learn new things. With respect to the minor child, M.C.A., the foster parents love him and show him affection, in addition to listening to him and nurturing him. *Id.* at 64-65.

Ms. Donovan testified that all three children have a close bond with their foster parents akin to a parent/child bond. Ms. Donovan testified that the children have been living stable lives in the foster homes. *Id.* at 65. Ms. Donovan stated that she had observed visits between Mother and Father and the children for the past two years on a weekly basis. She stated that there is a bond between the children and the parents. There is a language barrier between Mother and the children since the Mother does not speak English and the children do not speak Spanish. Ms. Donovan indicated that there's a very strong bond between Father and the minor children during the visits. However, despite the bond with the natural parents, Ms. Donovan still finds that the bond with the foster parents is stronger as the foster parents have been raising the two children, K.C.A. and E.C.A. for the past three years and M.C.A. for the past two years. *Id.* at 67, 69. Ms. Donovan stated that toward the end of the visits with the parents, the children seek the foster parents in order to leave with them. *Id.* at 69. Ms. Donovan believes that in light of the children's young age, the children would not suffer any detrimental impact should they be adopted by the foster parents. *Id.* at 67-68, 72. The minor children refer to the foster parents as "Mom and Dad". *Id.* at 75.

Ms. Donovan further testified that the natural parents were offered six hours of supervised visits a week with the minor children; however, they only chose to use three hours per week. *Id.* at 75. Ms. Donovan does not believe that the children would suffer any detrimental impact should the court terminate Mother's and Father's parental rights and believes that the adoption of the minor children would be in the children's best interest. *Id.* at 67-68.

## V.    ADDITIONAL CONSIDERATIONS UNDER 23 P.A.C.S.A. SECTION 2511(b)

### A.    ENVIORNMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate the parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

As "environmental factors beyond the control of Mother" was not the linchpin in the placement of the minor children and because of the presence of other independent factors, utilized in the placement of K.C.A., E.C.A., and M.C.A., this consideration does not apply and will not be addressed.

### B.   NEEDS AND WELFARE OF THE CHILD

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the

26

welfare of the child under one of the grounds of termination, the court must do so again.

***In re Matsock***, 611 A.2d 738 (1992).

The Court has done this and finds that the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning in concluding that these needs will be served by the termination of Mother's parental rights and Father's parental rights.

## VI.     ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

The Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in ***In re Z.P.***, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

> Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing ***In re G.P.***, 851 A.2d 967, 975-976 (Pa. Super. 2004)

The Court also provided that "above all else . . . adequate consideration must be given to the needs and welfare of the child . . . A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* at 1121 (internal citations omitted).

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

> "ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little
> > rational prospect of timely reunification."

*Id.* at 1125-26.

These ASFA-related policies are applicable in the present case of the children, K.C.A., E.C.A. and M.C.A. The two minor children, K.C.A. and E.C.A. have been in placement since October 3, 2016 and the minor child, M.C.A. has been in placement since June 18, 2017, in excess of eighteen (18) months from the filing date of the Petitions to terminate Mother's parental rights and Father's parental rights on February 19, 2019. Accordingly, a reasonable time of 18 months has long expired to remedy parental incapacity and there is little rational prospect of the timely reunification of K.C.A., E.C.A. and M.C.A. to their parents.

## VII. CONCLUSION

Mother and Father were given ample time to address and remedy the issues giving rise to placement, but have failed to successfully do so. The foster parents have amply demonstrated that they meet the physical, developmental and emotional needs of the minor children. The minor children, K.C.A., E.C. A. and M.C.A. have thrived under their care. The children need and deserve a permanent home with loving capable parents. The only way to provide this is to terminate the rights of the Mother and of the Father. Clearly it is in the children's best interest to do so.

Respectfully submitted,

BY THE COURT,

_____

JENNIFER L. ROGERS                                    J.

DATE:_____

28